**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| MATTHEW LODOWSKI, RAYNELLE JACKSON, and CARLOS GONZALES-RIVERA, individually and on behalf of all others similarly situated, | §<br>§<br>§<br>§<br>§ | |
| Plaintiffs, | §<br>§ | Civil Case No. 4:18-cv-00907 |
| v. | §<br>§ | JURY TRIAL DEMANDED |
| FACEBOOK, INC., CAMBRIDGE ANALYTICA LLC, ROBERT LEROY MERCER, and ALEKSANDR KOGAN, | §<br>§<br>§<br>§<br>§ | |
| Defendants. | | |

## FIRST AMENDED CLASS ACTION COMPLAINT

COMES NOW MATTHEW LODOWSKI, RAYNELLE JACKSON, and CARLOS GONZALES-RIVERA, individually and on behalf of all others similarly situated, alleging the following against defendants FACEBOOK, INC., CAMBRIDGE ANALYTICA LLC, ROBERT LEROY MERCER, and ALEKSANDR KOGAN (collectively, "Defendants"), based on personal knowledge as to Plaintiffs and Plaintiffs' own acts and on information and belief as to all other matters based upon, *inter alia*, the investigation conducted by and through Plaintiffs' undersigned counsel and would respectfully show the Court as follows:

### I.       SUMMARY OF CLAIMS

1.       Defendants ALEKSANDR KOGAN, CAMBRIDGE ANALYTICA LLC, and ROBERT LEROY MERCER conspired to improperly obtain, and did obtain, private and personal profile data from more than 87 million Facebook users without their consent or knowledge, including Plaintiffs and Class members, in excess of the authorization granted by Facebook and

Facebook users, in violation of the Stored Communications Act, 18 U.S.C. §§ 2701, *et seq*. ("SCA") and common law.

2.     Defendant FACEBOOK, INC. negligently failed to protect its user data, and, upon learning of the unauthorized access and use of this data, failed to take reasonable measures necessary to retrieve the data. Facebook also failed to notify its users that their data had been obtained when it learned of the unauthorized acquisition, and only spoke publicly on the issue after news stories exposed their negligent behavior.

## II.     PARTIES

3.     Plaintiff MATTHEW LODOWSKI is an individual resident of the State of Texas. Mr. Lodowski joined Facebook over seven years ago prior to 2013; and remembers viewing political ads through his individual Facebook account during the 2016 Presidential election.

4.     Plaintiff RAYNELLE JACKSON is an individual resident of the State of Texas. Ms. Jackson joined Facebook over a decade ago in late 2006; and received notification from Facebook, Inc. that her data had been compromised as a result of the Cambridge Analytica breach.

5.     Plaintiff CARLOS GONZALEZ-RIVERA is an individual resident of the State of Texas. Mr. Gonzalez-Rivera joined Facebook in late 2009; and received notification from Facebook, Inc. that his data had been compromised as a result of the Cambridge Analytica breach.

6.     Defendant FACEBOOK, INC. ("Facebook") is a corporation organized under the laws of the State of Delaware. Facebook's principal offices are located at 1601 Willow Road, Menlo Park, California 94025. It's registered agent for service of summons is Corporation Service Company, 251 Little Falls Drive, Wilmington, DE, 19808.

7.     Defendant CAMBRIDGE ANALYTICA LLC ("CA") is a limited liability company organized under the laws of the State of Delaware. CA's principal offices are located at

597 5th Avenue, 7th Floor, New York, NY 10017. CA's registered agent for service of summons is The Corporation Trust Company, 1209 Orange Street, Corporation Trust Center, Wilmington, DE, 19801. CA is a privately held company that combines data mining and data analysis with strategic communication for the electoral process. The Mercer family, known for its far-right conservative positions, reportedly invested millions of dollars in the company, and Rebekah Mercer (Robert Mercer's daughter) sits on CA's Board of Directors. An interview with CA's recently suspended CEO,[1] Alexander Nix, confirms that the Trump campaign paid for CA's services and that then-candidate Trump was "a good businessman."

8.      Defendant ROBERT LEROY MERCER ("Mercer") is an individual resident of the State of New York; and may be served with summons at 149 Harbor Rd., Saint James, NY 11780 or wherever he may be found. CA was created in 2013 by its British parent company SCL Group, Limited and defendant Mercer, who is reported to be a "secretive hedge fund billionaire" participating in American politics.

9.      Defendant ALEKSANDR KOGAN ("Kogan") is an individual resident of Cambridge, England and will be served with summons pursuant to the applicable laws and procedure for service outside the United States.

### III.      JURISDICTION AND VENUE

10.      This Court has jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because the aggregate amount in controversy exceeds $5,000,000, exclusive of interests and costs, there are more than 100 class members, and at least one class member is a citizen of a state different from Defendants and is a citizen of a foreign state.

---

[1] *See* https://ca-commercial.com/news/statement-board-directors (March 20, 2018).

11.     The Court has jurisdiction over the lawsuit under 28 U.S.C. §1332(a)(1) because Plaintiffs and Defendant are citizens of different U.S. states, and the amount in controversy exceeds $75,000, excluding interest and costs.

12.     Venue is proper in this district and division under 28 U.S.C. §1391(b)(2) because a substantial part of the events or omissions giving rise to this claim occurred in this district, including the decisions made by Facebook authorizing the information aggregation and CA's collection of the information.

## IV.     VICARIOUS LIABILITY

13.     All allegations herein of acts or omissions by Defendants include, but are not limited to, acts and omissions of Defendants' officers, directors, operators, managers, supervisors, employees, affiliates, subsidiaries, vice-principals, partners, agents, servants, and owners; and that such acts and omissions were committed with made with express and/or implied authority of Defendants, or were ratified or otherwise approved by Defendants; or that such acts or omissions were made in the routine normal course and scope of their agency and employment as Defendants' officers, directors, operators, managers, supervisors, employees, affiliates, subsidiaries, vice-principals, partners, agents, servants, and owners.

## V.     CONDITIONS PRECEDENT

14.     All conditions precedent have been performed or have occurred.

## VI.     FACTS

15.     On March 18, 2018, the Guardian published a report on CA.[2] The report explains an elaborate voter targeting program developed and used by CA to influence voter preferences in

_____

[2] *See* Carole Cadwalladr, " 'I made Steve Bannon's psychological warfare tool': meet the data war whistleblower," *The Guardian* (March 18, 2018), https://www.theguardian.com/news/2018/mar/17/data-war-whistleblower-christopher-wylie-faceook-nix-bannon-trump.

the 2016 presidential election for the United States for the benefit of then candidate Donald Trump. The Guardian's report details CA's voter targeting techniques using information the newspaper acquired from a whistleblower named Christopher Wylie.[3]

16.     Wylie has personal knowledge of the scheme, because he was a lead engineer in the project and was employed by CA. Wylie explained the scheme in detail.[4]

17.     According to the report, CA used a massive database, filled with Facebook users' surreptitiously acquired Facebook data, to target voters with information that was designed to manipulate or influence their voting preferences. Wylie further explained that data in the database was acquired with the assistance of a Cambridge University professor named Aleksandr Kogan.[5]

18.     Defendant Kogan contracted to work with CA and designed the plan to acquire user data. According to the report:

> "…he advertised for people who were willing to be paid to take a personality quiz on Amazon's Mechanical Turk and Qualtrics. At the end of which Kogan's app, called thisismydigitallife, gave him permission to access their Facebook profiles. And not just theirs, but their friends' too. On average, each 'seeder' – the people who had taken the personality test, around 320,000 in total – unwittingly gave access to at least 160 other people's profiles, none of whom would have known or had reason to suspect."

*Id*. This scheme allowed Kogan to collect, "millions of profiles in a matter of weeks." In doing so, Kogan exceeded the permission granted him by users and Facebook alike: on the one hand, Kogan exceeded the authorization granted him by users who took his personality test by collecting data from their friends—millions of additional users—who had not given Kogan their consent; and on

---

[3] *Id*.

[4] *Id*.

[5] *Id*.

the other hand Kogan exceeded the authorization granted him by Facebook, which gave him permission to pull Facebook data, "but for academic purposes only."[6]

19.     Aleksandr Kogan did all of this in the employ of CA, to help aggregate a massive dataset that would allow CA to target users for the purpose of influencing their political preferences through advertising and misinformation. According to the report, "email correspondence between CA employees and Kogan, [shows] that Kogan had collected millions of profiles in a matter of weeks. But neither Wylie nor anyone else at CA had checked that it was legal."

20.     Wylie told the Guardian, "He has receipts showing that CA spent $7m to amass this data, about $1m of it with [Global Science Research]." Global Science Research (GSR) was a company owned by Aleksandr Kogan, "specifically premised on the harvesting of Facebook data, so that it could be matched to personality traits and voter rolls." CA received its funding from Defendant ROBERT LEROY MERCER, who met with CA CEO Alexander Nix and Christopher Wylie in New York to discuss the plan. Wylie told the Guardian about that meeting, stating, "'In politics, the money man is usually the dumbest person in the room. Whereas it's the opposite way around with Mercer,' says Wylie. 'He said very little, but he really listened. He wanted to understand the science. And he wanted proof that it worked.'"

21.     Facebook knew about the data extraction. According to Wylie, "Their security protocols were triggered because Kogan's apps were pulling this enormous amount of data, but apparently Kogan told them it was for academic use. So they were like, 'Fine'." However, the data extraction was not for academic use, it was for commercial use by Kogan and CA.

22.     Facebook first learned that the data extraction was not for academic use when the Guardian published its first report about CA acquiring Facebook data and using it to support Ted

---

[6] *Id.*

Cruz in his campaign to be the United States Republican candidate.[7] This report was published in December 2015, but Facebook failed to take action until months later, "And then, all they did was write a letter."[8] In August 2016, "Facebook lawyers wrote to Wylie, who left CA in 2014, and told him the data had been illicitly obtained and that '***GSR was not authorized to share or sell it***'. They said it must be deleted immediately." (emphasis added).[9]

23.      As far as deleting the data, Wylie told the Guardian, "'I already had. But literally all I had to do was tick a box and sign it and send it back, and that was it,' says Wylie. 'Facebook made zero effort to get the data back.' There were multiple copies of it. It had been emailed in unencrypted files."[10]

24.      A spokesperson for Facebook told the Guardian, "If these reports are true, ***it's a serious abuse of our rules***. Both Aleksandr Kogan as well as the SCL Group and CA certified to us that they destroyed the data in question." (emphasis added).[11]

25.      Mark Zuckerberg, Facebook's CEO, admitted in an interview on CNN on March 21, 2018, "This was a major breach of trust, and I'm really sorry that this happened. You know, we have a basic responsibility to protect people's data and if we can't do that then we don't deserve to have the opportunity to serve people."[12]

---

[7] Ben Jacobs, "*Ted Cruz using firm that harvested data on millions of unwitting Facebook users*," the Guardian (December 11, 2015), https://www.theguardian.com/us-news/2015/dec/11/senator-ted-cruz-president-campaign-facebook-user-data.

[8] *Id.*

[9] Carole Cadwalladr, " 'I made Steve Bannon's psychological warfare tool': meet the data war whistleblower," *The Guardian* (March 18, 2018), https://www.theguardian.com/news/2018/mar/17/data-war-whistleblower-christopher-wylie-faceook-nix-bannon-trump.

[10] *Id.*

[11] *Id.*

[12] *See* Danielle Wiener-Bronner, "Mark Zuckerberg has regrets: 'I'm sorry that this happened'"CNN (March 21, 2018), http://money.cnn.com/2018/03/21/technology/mark-zuckerberg-apology/index.html.

26.     Defendant Facebook has since notified users through its service that 87 million users were affected by the breach.[13]

27.     Defendant Facebook's "Data Use Policy," that was effective at the time, stated in part:

> **How we use the information we receive**
> We use the information we receive about you in connection with the services and features we provide to you and other users like your friends, our partners, the advertisers that purchase ads on the site, and the developers that build the games, applications, and websites you use. For example, in addition to helping people see and find things that you do and share, we may use the information we receive about you:
>
> - ***as part of our efforts to keep Facebook products, services and integrations safe and secure***;
> - ***to protect Facebook's or others' rights or property***;
> - to provide you with location features and services, like telling you and your friends when something is going on nearby;
> - to measure or understand the effectiveness of ads you and others see, including to deliver relevant ads to you;
> - to make suggestions to you and other users on Facebook, such as: suggesting that your friend use our contact importer because you found friends using it, suggesting that another user add you as a friend because the user imported the same email address as you did, or suggesting that your friend tag you in a picture they have uploaded with you in it; and
> - for internal operations, including troubleshooting, data analysis, testing, research and service improvement.

(emphasis added).[14]

28.     Defendant Facebook's "Data Use Policy" additionally stated:

> While you are allowing us to use the information we receive about you, you always own all of your information. ***Your trust is important to us***, which is why we don't share information we receive about you with others unless we have:

---

[13] *See* Nadeem Badshah, "Facebook to contact 87 million users affected by data breach," *The Guardian* (April 8, 2018), https://www.theguardian.com/technology/2018/apr/08/facebook-to-contact-the-87-million-users-affected-by-data-breach.

[14] *Data Use Policy*, Facebook, Inc. (Date of Last Revision: November 15, 2013), https://www.facebook.com/full_data_use_policy.

- received your permission;
- given you notice, such as by telling you about it in this policy; or
- removed your name and any other personally identifying information from it.

(emphasis added).[15]

29.     The Federal Trade Commission issued guidance on how to appropriately respond to data breaches, titled "Data Breach Response: A Guide for Business," in which it advises, "When your business experiences a data breach, notify law enforcement, other affected businesses, and affected individuals."[16] Additionally, TEX. BUS. & COMM. CODE § 521.053 *requires* businesses that maintain sensitive personal information to notify individuals if their sensitive personal information was breached. Facebook violated this Texas statute because it did not notify its users of the breach when news of the breach became public in 2015.[17]

## VII.     CLASS ACTION ALLEGATIONS

30.     Pursuant to Rule 23(b)(2), (b)(3) and (c)(4) of the Federal Rules of Civil Procedure, Plaintiffs, individually and on behalf of all others similarly situated, brings this lawsuit on behalf of themselves and as a class action on behalf of the following class:

> All persons who registered for Facebook accounts in the United States and whose Personal Information was obtained from Facebook by Cambridge Analytica without authorization or in excess of authorization.

31.     Excluded from the Class are Defendants and any entities in which any Defendant or their subsidiaries or affiliates have a controlling interest, and Defendants' officers, agents, and

---

[15] *Id.*

[16] FEDERAL TRADE COMMISSION, "Data Breach Response: A Guide for Business" (2016).

[17] *See* TEX. BUS. & COMM. CODE §§ 521.001, *et. seq*., the Identity Theft Enforcement and Protection Act ("ITEPA"). "A person who violates this chapter is liable to this state for a civil penalty of at least $2,000 but not more than $50,000 for each violation. The attorney general may bring an action to recover the civil penalty imposed under this subsection." TEX. BUS. & COMM. CODE § 521.151.

employees. Also excluded from the Class are the judge assigned to this action, and any member of the judge's immediate family.

## A.      Numerosity

32.      The first requirement of Rule 23(a) is met when "the class is so numerous that joinder of all members is impractical." Fed. R. Civ. P. 23(a)(1). Generally, the numerosity requirement is met when the class comprises 40 or more members. *See Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1553 (11th Cir. 1986), *cert. denied*, 479 U.S. 853 (1986). Numerosity in this case is easily satisfied. The members of the Class are so numerous that joinder of all members of any Class would be impracticable. Plaintiffs reasonably believe that Class members number in excess of 87 million people or more in the aggregate and well over 1,000 in the smallest of the classes. The names and addresses of Class members are identifiable through documents maintained by Defendants.

## B.      Commonality and Predominance

33.      Rule 23(a)(2) requires that "there are questions of law or fact common to the class." To meet the commonality requirement, the plaintiffs must demonstrate that the proposed class members "have suffered the same injury." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 (1982)). In other words, commonality requires that the claims of the class "depend upon a common contention…of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id*. Commonality may be shown when the claims of all class members "depend upon a common contention" and "even a single common question will do." *Dukes*, 131 S. Ct. at 2545, 2556.  This

action involves common questions of law or fact, which predominate over any questions affecting individual Class members, including:

    a.   Whether Facebook represented that it would safeguard Plaintiffs' and Class members' Personal Information and not disclose it without consent;

    b.   Whether CA improperly obtained Plaintiffs' and Class members' Personal Information without authorization or in excess of any authorization;

    c.   Whether Facebook was aware of CA's improper collection of Plaintiffs' and Class members' Personal Information;

    d.   Whether Facebook owed a legal duty to Plaintiffs and the Class to exercise due care in collecting, storing, safeguarding, and/or obtaining their Personal Information;

    e.   Whether Facebook breached a legal duty to Plaintiffs and the Class to exercise due care in collecting, storing, safeguarding, and/or obtaining their Personal Information;

    f.   Whether Class Members' Personal Information was obtained by CA;

    g.   Whether Defendants' conduct violated the SCA, 18 U.S.C. §§ 2701, *et seq*.;

    h.   Whether Defendants' engaged in a civil conspiracy to violate the SCA, 18 U.S.C. §§ 2701, *et seq*.;

    i.   Whether Plaintiffs and the Class are entitled to equitable relief, including, but not limited to, injunctive relief and restitution; and

j.   Whether Plaintiffs and the other Class members are entitled to actual,

statutory, or other forms of damages, and other monetary relief.

34.    Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs individually and on behalf of the members of the class. Similar or identical statutory and common law violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quantity and quality, to the numerous common questions that dominate this action.

**C.    Typicality**

35.    Typicality requires that Plaintiffs' claims be typical of other Class members. Fed. R. Civ. P. 23(a)(3). The typicality inquiry focuses on the similarity between the named Plaintiffs' legal and remedial theories and the theories of those whom they purport to represent. *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 625 (5th Cir. 1999).  The purpose of the typicality requirement is to ensure that the representative's interest is "aligned with those of the represented group, and in pursuing his own claims, the named plaintiff will also advance the interests of the class members." *In re American Medical Systems, Inc.*, 75 F.3d 1069, 1082 (6th Cir. 1996); *see also In re Ford Motor Co. Bronco II*, 177 F.R.D. 360, 366–67 (E.D. La. 1997) (noting that purpose of typicality element is to ensure that interests of absent class members are protected).  Thus, the requirement is satisfied where, in proving his own case, the representative's "claims have the same essential characteristics" as those of the Class. *See James v. City of Dallas*, 254 F.3d 551, 571 (5th Cir. 2001), *abrogated in part by, Wal–Mart, supra, as recognized in M.D. ex rel. Stukenberg*, 675 F.3d 832, 839–40 (5th Cir. 2012).  Finally, "a finding of commonality will ordinarily support a finding of typicality." *General Tel. Co. v. Falcon*, 457 U.S. 147, 157 n.13 (1982) (noting how the requirements of commonality and typicality "merge").

36.     Plaintiffs' claims are typical of the claims of the other members of their respective classes because, among other things, Plaintiffs and the other class members were injured through the substantially uniform misconduct by Defendants. Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all other Class members, and there are no defenses that are unique to Plaintiffs. The claims of Plaintiffs and those of other Class members arise from the same operative facts and are based on the same legal theories.

**D.     Adequacy of Representation**

37.     Rule 23(a) requires that the representative parties have and will continue to "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "To meet Rule 23 requirements [for adequate representation], the court must find that class representatives, their counsel, and the relationship between the two are adequate to protect the interests of absent class members." *Unger v. Amedisys Inc.*, 401 F.3d 316, 321 (5th Cir. 2005).  The "long-established standard" for the adequacy determination on which the Fifth Circuit principally relies requires "an inquiry into [1] the zeal and competence of the representative[s'] counsel and…[2] the willingness and ability of the representative[s] to take an active role in and control the litigation and to protect the interests of absentees[.]" *Berger v. Compaq Computer Corp.*, 257 F.3d 475, 479 (5th Cir. 2001).

38.     Plaintiffs are adequate representatives of the class because their interests do not conflict with the interests of the other Class members he seeks to represent; they have retained counsel competent and experienced in complex class action litigation and Plaintiffs will prosecute this action vigorously. The Class members' interests will be fairly and adequately protected by Plaintiffs and their counsel.

**E.     Superiority and Predominance**

39.     A class action may be maintained under Rule 23(b)(3) if all Rule 23(a) requirements are met and "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."[18] *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615-616 (1997) (addressing predominance and superiority requirements).

40.     The predominance inquiry "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Id.* at 623.The "superiority analysis" of Rule 23(b)(3) "requires an understanding of the relevant claims, defenses, facts, and substantive law presented in the case." *Maldonado v. Ochsner Clinic Found.*, 493 F.3d 521, 525 (5th Cir. 2007).   Class actions are particularly appropriate where, as here, "it is necessary to permit the plaintiffs to pool claims which would be uneconomical to litigate individually." *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985).

41.     A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this matter as a class action. The damages, harm, or other financial detriment suffered individually by Plaintiffs and the other members of their respective classes are relatively small compared to the burden and expense that would be required to litigate their claims on an individual basis against Defendants, making it impracticable for Class members to individually seek redress for Defendants' wrongful conduct. Even if Class members could afford individual

---

[18] Pertinent matters include: (1) the class members' interests in individually controlling the prosecution or defense of separate actions, (2) the extent and nature of any litigation concerning the controversy already begun by or against class members, (3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum, and (4) the likely difficulties in managing a class action. Fed. R. Civ. P. 23(b)(3)(A)-(D).

litigation, the court system could not. Individualized litigation would create a potential for inconsistent or contradictory judgments and increase the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

42.     Further, Defendants have acted or refused to act on grounds generally applicable to the Class and, accordingly, final injunctive or corresponding declaratory relief with regard to the members of the Class as a whole is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

43.     Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

    a.   Whether Class Members' Personal Information was obtained by CA;

    b.   Whether (and when) Facebook knew about the improper collection of Personal Information;

    c.   Whether Defendants' conduct violated the SCA, 18 U.S.C. §§ 2701, *et seq.*;

    d.   Whether Facebook's representations that they would secure and not disclose without consent the Personal Information of Plaintiffs and members of the classes were facts that reasonable persons could be expected to rely upon when deciding whether to use Facebook's services;

e.   Whether Facebook misrepresented the safety of its many systems and services, specifically the security thereof, and their ability to safely store Plaintiffs' and Class Members' Personal Information;

f.   Whether Facebook failed to comply with its own policies and applicable laws, regulations, and industry standards relating to data security;

g.   Whether Defendants' acts, omissions, misrepresentations, and practices were and are likely to deceive consumers;

h.   Whether Defendants' engaged in a civil conspiracy to violate the SCA, 18 U.S.C. §§ 2701, *et seq.*;

i.   Whether Facebook failed to adhere to its posted privacy policy concerning the care it would take to safeguard and protect Class members' Personal Information; and

j.   Whether Facebook negligently and materially failed to adhere to its posted privacy policy with respect to the extent of its disclosure of users' data.

## VIII.   <u>CAUSES OF ACTION</u>

**A.  COUNT I – STORED COMMUNICATIONS ACT, 18 U.S.C. §§ 2701, *et seq*.
(Kogan and CA)**

44.   Plaintiffs hereby adopt by reference each and every paragraph of the Facts and allegations stated in this Complaint as if fully and completely set forth herein.

45.   The Stored Communications Act ("SCA") allows a private right of action against anyone who "(1) intentionally accesses without authorization a facility through which an electronic communication service is provided; or (2) intentionally exceeds an authorization to access that facility; and thereby obtains, alters, or prevents authorized access to a wire or electronic

communication while it is in electronic storage in such system." *See* 18 U.S.C. § 2701(a); *see also id.* § 2707(a) (cause of action).

46.     The court may assess damages under the SCA including "actual damages suffered by the plaintiffs and any profits made by the violator as a result of the violation, but in no case *shall* a person entitled to recover receive *less than* the sum of $1,000." 18 U.S.C. § 2707(c) (emphasis added).

47.     Defendant Kogan exceeded his authorization to access Facebook's servers, and thereby obtained users' electronic communications while they were in electronic storage on Facebook's system, network, and/or servers.

48.     Defendant CA funded and facilitated Kogan's unauthorized access and collection of user data.

49.     As a result of Defendants' actions, Plaintiffs and the Class are entitled to statutory damages of $1,000 per violation and injunctive relief from Defendants Kogan and CA for violating Plaintiffs' and Class members' privacy rights under the SCA.

## B.  COUNT II – CIVIL CONSPIRACY
### (Kogan, CA, and Mercer)

50.     Plaintiffs hereby adopt by reference each and every paragraph of the Facts and allegations stated in this Complaint as if fully and completely set forth herein.

51.     A civil conspiracy is composed of two or more persons combining to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means. *Massey v. Armco Steel Co.,* 652 S.W.2d 932, 934 (Tex.1983). The elements of a cause of action for civil conspiracy in Texas are (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the

proximate result. *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 623 F. Supp. 2d 798, 808–09 (S.D. Tex. 2009).

52.     Defendants Kogan, CA, and Robert Leroy Mercer conspired to harvest Facebook users' data in excess of Kogan's authorization. Defendants' entire business relationship was premised on this act, which violated users' privacy rights enshrined by the Stored Communications Act.

53.     Defendants' conspired to—and achieved their purpose to—harm Plaintiffs and the Class by surreptitiously harvesting data without users' or Facebook's consent.

54.     Kogan was able to obtain user data in excess of his authorization because CA and Robert Leroy Mercer funded the advertising and labor necessary to achieve their illegal purpose.

55.     As a result of Defendants' conspiracy, Plaintiffs and the Class are entitled to statutory damages and injunctive relief from Aleksandr Kogan, CA, and Robert Leroy Mercer for their participation in violating Plaintiffs' and Class members' privacy rights.

## C.  COUNT III – NEGLIGENCE
   **(Facebook)**

56.     Plaintiffs hereby adopt by reference each and every paragraph of the Facts and allegations stated in this Complaint as if fully and completely set forth herein.

57.     Defendant Facebook, Inc. had a duty to protect the privacy of its users.

58.     Defendant Facebook, Inc. breached that duty when it failed to notify its users of the data breach and failed to take adequate remedial measures to protect user data.

59.     Defendant Facebook, Inc.'s failure to notify its users of the data breach and failure to take adequate remedial measures to protect users' data caused Plaintiffs and Class members harm, because users privacy rights were violated, they were targeted as a result of the data breach, and they lacked adequate notice to protect themselves and their privacy interests.

## IX.   JURY DEMAND

60.     Plaintiffs assert their rights under the Seventh Amendment to the U.S. Constitution

and demands, in accordance with Federal Rule of Civil Procedure 38, a trial by jury on all issues.

## X.     PRAYER

**WHEREFORE, PREMISES CONSIDERED**, Plaintiffs Matthew Lodowski, Raynelle

Jackson, and Carlos Gonzalez-Rivera, individually and on behalf of the putative class members,

respectfully prays that the Court enter an order: (a) certifying the United States Class and

appointing Plaintiffs as Class Representatives; (b) finding that Facebook's conduct was negligent;

(c) enjoining all Defendants from engaging in further negligent and unlawful business practices;

(d) awarding Plaintiffs and the Class members nominal, actual, compensatory, and consequential

damages; (e) awarding Plaintiffs and the Class members statutory damages and penalties, as

allowed by law; (f) awarding Plaintiffs and the Class members restitution and disgorgement; (g)

awarding Plaintiffs and the Class members pre-judgment and post-judgment interest; (h) awarding

Plaintiffs and the Class members reasonable attorneys' fees costs and expenses, and; (i) granting

such other relief as the Court deems just and proper.

Respectfully Submitted,

**HUGHES ELLZEY, LLP**

_____ */s/ W. Craft Hughes* _____
W. Craft Hughes
Texas Bar No. 24046123
Jarrett L. Ellzey
Texas Bar No. 24040864
2700 Post Oak Blvd., Ste. 1120
Galleria Tower I
Houston, TX 77056
Phone: (713) 322-6387
Fax: (888) 995-3335
craft@hughesellzey.com
jarrett@hughesellzey.com

**ATTORNEYS FOR PLAINTIFFS
AND THE PUTATIVE CLASS**

## **CERTIFICATE OF SERVICE**

I certify a copy of the foregoing document was filed in accordance with the protocols for e-filing in the United States District Court for the Southern District of Texas on <u>May 29, 2018</u>, and served on all counsel of record who have appeared and consented to electronic notification *via* CM/ECF.

<u>*/s/ W. Craft Hughes*</u>

W. Craft Hughes